508 A.2d 964

**Judith Ann TAYLOR**

v.

**Neil R. TAYLOR, III.**

**No. 23, Sept. Term, 1985.**

Court of Appeals of Maryland.

May 22, 1986.

Bruce A. Kaufman (Thomas D. Wolfe and Miller, Rosenthal & Kaufman, P.A., on brief), Baltimore, for appellant.

Ronald M. Naditch (Ronald M. Naditch, P.A., on brief), Annapolis, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

McAULIFFE, Judge.

We here decide that a circuit court in the exercise of its general equity powers may order joint custody of children. We neither affirm nor reverse the order for joint custody in this case, but remand the case to the trial court for reconsideration in the light of the principles discussed herein.

The parties to this appeal are Judith Ann Taylor (Appellant) and Neil Randall Taylor, III (Appellee). The Taylors were married on November 26, 1977, and are the parents of

Christina Lee Taylor, born April 9, 1979, and Neil Randall Taylor, IV, born August 5, 1980.

During the summer of 1982, the Taylors began experiencing marital difficulties and on September 10, 1982, they separated. Appellant left the marital home in Elkton, and took up residence with her parents in nearby Newark, Delaware. The children continued to reside in the marital home. On September 29, Appellee filed a Bill of Complaint in the Circuit Court for Cecil County seeking an absolute divorce and temporary and permanent custody of the children. Appellant filed an answer on November 3 in which she requested custody of the children *pendente lite* and permanently.[1]

On November 24 a "visitation schedule," signed only by counsel, was filed, detailing an apparent agreement between the parties, and specifying the days and times that each party would have the children.[2] On December 7, Judge Donaldson Cole entered a *pendent lite* order granting the parties "joint custody" of the children "in consideration of the agreement of the parties." The order further provided that the children were to reside with Appellee in the family home, and incorporated by reference the visitation schedule previously filed.

On April 7, 1983, Appellant changed attorneys. Five days later she filed an amended and supplemental answer in which she requested that the order of December 7, 1982, be stricken, and that she be awarded care and custody of the

---

1. Appellant's answer recited that at the time of separation the parties agreed the children would reside with Appellee in the marital home and Appellant would be free to be with the children on a daily basis, both in and out of the home. Appellant contended, however, that subsequent to that time it became apparent that Appellee was unable to cope with the responsibility of caring for the children, and additionally he would not allow Appellant to have the children with her in her mother's home.

2. The schedule provided that the children would be with Appellant each weekday morning, all day and overnight on each Tuesday, and on alternate weekends.

children. Appellant alleged that the order providing joint custody *pendente lite* was the result of "a meeting with the court without her knowledge," and of action taken by her attorney without her authority. Trial on the merits occurred shortly thereafter, and following a five day trial Judge H. Kenneth Mackey granted Appellee's request for an absolute divorce, and ordered continuation of the arrangement spelled out in the "visitation agreement," which he characterized as "a sort of joint custody." Noting that under the arrangement agreed to by the parties the marital home in Elkton served as the primary residence of the children, the trial judge entered a use and possession order in favor of Appellee. Appellant's Motion for Reconsideration was denied, and she noted an appeal to the Court of Special Appeals. That court affirmed. *Taylor v. Taylor,* 60 Md.App. 268, 482 A.2d 164 (1984). We granted certiorari to consider the following two questions:

1) Whether a trial judge in Maryland has the authority to grant joint custody; and

2) Whether, if the trial judge did have the authority to grant such an award, he abused his discretion under the facts of this case.

I

## Definition of Joint Custody

This dynamic and emotionally charged field of law is unfortunately afflicted with significant semantical problems, described by one writer as a "frightful lack of linguistic uniformity." [3] The inability of courts and commentators to agree on what is meant by the term "joint custody" makes difficult the task of distilling principles and guidelines from a rapidly growing body of literature and case law. What one writer sees as an amorphous concept another sees as a structured legal arrangement. While it is clear that both parents in a joint custody arrangement function

---

3.  D. Miller, *Joint Custody,* 13 Fam.L.Q. 345, 376 (Fall, 1979).

as "custodians" in the sense that they are actually involved in the overall welfare of their child, a distinction must be made between sharing parental responsibility in major decision-making matters and sharing responsibility for providing a home for the child.

Embraced within the meaning of "custody" are the concepts of "legal" and "physical" custody. Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare.[4] *See generally* P. Axelrod, A. Everett and A. Haralambie, *Joint Custody,* in *Handling Child Custody Cases* § 5.01, at 50 (1983); A. Berman and D. Kirsh, *Definitions of Joint Custody,* 5 Fam.Advoc. 2 (Fall, 1982); J. Ester, *Maryland Custody Law-Fully Committed to the Child's Best Interests?,* 41 Md.L.Rev. 225, 251 (1982); *Joint Custody and Shared Parenting* ch. 1, at 7 (J. Folberg ed. 1984). Joint legal custody means that both parents have an equal voice in making those decisions, and neither parent's rights are superior to the other.

Physical custody, on the other hand, means the right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody. Joint physi-

---

4. The parent not granted legal custody will, under ordinary circumstances, retain authority to make necessary day-to-day decisions concerning the child's welfare during the time the child is in that parent's physical custody. Thus, a parent exercising physical custody over a child, whether pursuant to an order of visitation or to an order of shared physical custody, necessarily possesses the authority to control and discipline the child during the period of physical custody. Similarly, that parent has the authority to consent to emergency surgery or emergency major medical care when there is insufficient time to contact the parent having legal custody. We need not here consider the issues that may arise when the parent having legal custody cannot agree with the parent exercising physical custody concerning emergency medical care. This residuum of authority should be exercised so as not to conflict with the long range decisions and policies made by the parent having legal custody.

cal custody is in reality "shared" or "divided" custody.[5] Shared physical custody may, but need not, be on a 50/50 basis, and in fact most commonly will involve custody by one parent during the school year and by the other during summer vacation months, or division between weekdays and weekends, or between days and nights.

■ With respect to physical custody, there is no difference between the rights and obligations of a parent having temporary custody of a child pursuant to an order of shared physical custody, and one having temporary custody pursuant to an award of visitation. Thus, a determination to grant legal custody to one parent and to allocate physical custody between the parents may be accomplished either by granting sole custody to one parent and specified rights of visitation to the other, or by granting legal custody to one parent and specified periods of physical custody to each parent. In either instance the effect will be the same.

■ Proper practice in any case involving joint custody dictates that the parties and the trial judge separately consider the issues involved in both joint legal custody and joint physical custody, and that the trial judge state specifically the decision made as to each.

## II

### Authority to Award Joint Custody

■ Appellant argues that "[t]here is no express statutory authority for an award of joint custody in Maryland" and that in the absence of such authority a court of equity[6]

---

**5.** The term "split custody" is generally used to describe the situation in which one parent is given sole custody of some of the children of the parties, with sole custody of the remaining children going to the other parent, and cross rights of visitation. Again, however, the use of terms is not uniform and some courts speak of "divided custody" to describe a situation involving split custody.

**6.** At the time of the entry of the decree from which this appeal was taken, a circuit court of this State sat either as a court of law or as a

lacks jurisdiction to grant joint custody. A strong argument can be made that authority to award joint custody is implicit in the language of the several statutes relating to child custody. *See Taylor v. Taylor, supra,* 60 Md.App. at 272–75, 482 A.2d 164; *Kerns v. Kerns,* 59 Md.App. 87, 90–94, 474 A.2d 925 (1984); 68 Op.Atty.Gen. 228, 230 n. 1 [Opinion No. 83–024, June 2, 1983]. We need not decide that issue, for we hold the authority to grant joint custody is an integral part of the broad and inherent authority of a court exercising its equitable powers to determine child custody.

■ Our inquiry, therefore, is not whether the Legislature has granted a power, but whether it has attempted to limit a power that exists as a part of the inherent authority of the court. We find no such limitation intended or expressed.

In the trial of a divorce case, a court of equity may often be required to draw upon separate sources of jurisdiction to afford complete relief. The power to grant a divorce is not a part of the common law jurisdiction of a court of equity, and prior to 1841 was exercised solely by the Legislature.[7] *See McAlear v. McAlear,* 298 Md. 320, 328 n. 7, 469 A.2d 1256 (1984); *Thomas v. Thomas,* 294 Md. 605, 609–10, 451 A.2d 1215 (1982); *Winston v. Winston,* 290 Md. 641, 646 n. 3, 431 A.2d 1330 (1981); *Courson v. Courson,* 213 Md. 183,

---

court of equity. Effective July 1, 1984, as a result of a comprehensive revision of the Maryland Rules of Procedure, this distinction was abolished. Maryland Rule 2–301. While this change makes possible the joinder in a single action of claims previously cognizable only as separate actions at law or in equity, it does not avoid the occasional necessity of identifying the character and historical genesis of each claim for purposes of determining entitlement to jury trial, extent of jurisdiction, application of particular principles, or the like. Our holding in this case is not affected by the rules change, and our reference to a court of equity is intended to apply to a circuit court exercising its general equitable jurisdiction.

7. By enactment of ch. 262 of the 1841 Laws of Maryland the Legislature granted jurisdiction of all divorce actions to the equity courts of this State. This law is now codified at Maryland Code (1984) § 1–201(a)(4) of the Family Law Article.

186, 129 A.2d 917 (1957). The authority to award alimony, and to determine custody of children and provide for their support, did not emanate from the Legislature. *Glading v. Furman,* 282 Md. 200, 208, 383 A.2d 398 (1978); *Coleman v. Coleman,* 228 Md. 610, 613, 180 A.2d 875 (1962). *See also* 1 *Nelson on Divorce and Annulment* § 1.03, at 10 (J. Henderson 2d ed. 1945), wherein the author states:

[S]uch matters as the awarding of alimony, and determining custody of children and providing for their support, though commonly incident to a divorce suit, have a distinct origin and are properly to be regarded as independent causes of action only permissibly joined with the cause of action for divorce, usually by virtue of statute. In so far as they are concerned, courts of equity historically had jurisdiction, and the proceedings are truly equitable. (Footnote omitted).

At the time the instant case was decided, the statute relating to the jurisdiction of an equity court in child custody and related matters was codified at Maryland Code (1974, 1980 Repl.Vol., 1983 Cum.Supp.) § 3–602 of the Courts and Judicial Proceedings Article.[8] It provided, in pertinent part:

(a) *Jurisdiction of courts of equity.*—A court of equity has jurisdiction over the custody, guardianship, legitimation, maintenance, visitation and support of a child. In exercising its jurisdiction, the court may:

(1) Direct who shall have the custody or guardianship of a child;

(2) Determine the legitimacy of a child, pursuant to § 1–208 of the Estates and Trusts Article of this Code;

(3) Decide who shall be charged with the support and maintenance of a child, pendente lite or permanently;

(4) Determine who shall have visitation rights to a child. At any time following the termination of a marriage, the court may consider a petition for reasonable

---

**8.** Section 3–602 has been re-codified without substantive change as Maryland Code (1984) § 1–201 of the Family Law Article.

visitation by one or more of the grandparents of a natural or adopted child of the parties whose marriage has been terminated, and may grant such visitation if the court believes it to be in the best interests of the child; or

(5) From time to time set aside or modify its decree or order concerning the child.

(b) *Jurisdiction of juvenile or criminal court not affected.*—Nothing in this section takes away or impairs the jurisdiction of the juvenile court or criminal court with respect to the custody, guardianship, maintenance, visitation, and support of a child. This section does not limit or preclude paternity proceedings under Article 16 of this Code except after the legitimation of a child under this section.

What this Court said in *Barnard v. Barnard,* 157 Md. 264, 267, 145 A. 614 (1929) concerning a predecessor statute, Maryland Code (1924) Art. 16, § 80, applies as well to § 3–602:

> From this language it will be seen that courts of equity in this state have full power, and it is their duty, to determine who shall have the custody, control and guardianship of minor children, and who shall be charged with their maintenance and support, when applied to by any of the persons mentioned in the statute; and this without regard to the question of whether or not the parents of said child or children have been divorced or are living apart. This section is declaratory of the inherent power of courts of equity over minors, and in the exercise thereof it should be exercised with the paramount purpose in view of securing the welfare and promoting the best interest of the children.

A second statute in effect at the time this case was decided, and relating to the custody and guardianship of

children, was Maryland Code (1957, 1983 Repl.Vol.) Art. 72A, § 1.[9] It provided as follows:

> The father and mother are the joint natural guardians of their child under eighteen years of age and are jointly and severally charged with its support, care, nurture, welfare and education. They shall have equal powers and duties, and neither parent has any right superior to the right of the other concerning the child's custody. If either the father or mother dies, or abandons his or her family, or is incapable of acting, the guardianship devolves upon the other parent. Where the parents live apart, the court may award the guardianship of the child to either of them, but, in any custody proceeding, neither parent shall be given preference solely because of his or her sex. Provided: The provisions of this article shall not be deemed to affect the existing law relative to the appointment of a third person as guardian of the person of the minor where the parents are unsuitable, or the child's interests would be adversely affected by remaining under the natural guardianship of its parent or parents.

We find no indication in either statute of a legislative intent to limit the broad and inherent power of an equity court to deal fully and completely with matters of child custody. A court faced with a question of child custody upon the separation of the parents may continue the joint custody that has existed in the past, or award custody to one of the parents, or to a third person, depending upon what is in the best interest of the child. With respect to the authority of an equity court in dealing with child custody, this section is simply declaratory of the inherent power that existed at common law, and does not operate as a limitation thereof. As has historically been the case, the power of the court is

---

**9.** Article 72A, § 1 was re-codified in 1984 at § 5–203 of the Family Law Article. No substantive change was made. House Bill 810, enacted as Chapter 65 of the 1986 Laws of Maryland, to become effective July 1, 1986, amends § 5–203(c)(1) to provide that a court may award joint custody as well as sole custody. We consider this amendment to be declaratory of existing common law.

very broad so that it may accomplish the paramount purpose of securing the welfare and promoting the best interest of the child.

## III

### Joint Custody Considerations

This Court last considered the issue of joint custody in *McCann v. McCann*, 167 Md. 167, 172, 173 A. 7 (1934), in which our predecessors denounced joint control of a child as an arrangement "to be avoided, whenever possible, as an evil fruitful in the destruction of discipline, in the creation of distrust, and in the production of mental distress in the child." Significant societal changes that have occurred over the ensuing half century mandate our re-examination of those views.

Proponents of joint custody point out that it offers an opportunity for a child to enjoy a meaningful relationship with both parents, and may diminish the traumatic effects upon the child that can result from a dissolution of the marriage. While sole custody may reduce the non-custodial parent to the second class status of a visitor, joint custody allows both parties to function as, and be perceived as, parents. The sharing of the burdens as well as the joys of child-rearing may be particularly helpful in the many instances where both parents are employed. Where joint custody has been appropriate, benefits have accrued not only to the child, but to parents as well.

The principal criticism leveled at joint custody is that it creates confusion and instability for children at the very time they need a sense of certainty and finality in their lives. Additionally, it is said to present too great an opportunity for manipulation of the parents by the child. Critics also contend that the option of joint custody creates too great a temptation to the trial judge to avoid choosing one parent and disappointing the other by simply awarding custody to both. Certainly, joint custody is not appropriate in every case. Indeed, it has been suggested that it is

appropriate only in a small minority of cases. But when appropriate, joint custody can result in substantial advantages to children and parents alike, and the feasibility of such an arrangement is certainly worthy of careful consideration.

■ Formula or computer solutions in child custody matters are impossible because of the unique character of each case, and the subjective nature of the evaluations and decisions that must be made. At best we can discuss the major factors that should be considered in determining whether joint custody is appropriate, but in doing so we recognize that none has talismanic qualities, and that no single list of criteria will satisfy the demands of every case.

■ We emphasize that in any child custody case, the paramount concern is the best interest of the child. As Judge Orth pointed out for the Court in *Ross v. Hoffman,* 280 Md. 172, 175 n. 1, 372 A.2d 582 (1977), we have variously characterized this standard as being "of transcendent importance" and the "sole question." The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak.

■ The question of whether to award joint custody is not considered in a vacuum, but as a part of the overall consideration of a custody dispute. The availability of joint custody, in any of its multiple forms, is but another option available to the trial judge. Thus, the factors that trial judges ordinarily consider in child custody cases remain relevant.[10] The following discussion of factors particularly relevant to a consideration of joint custody is in no way intended to minimize the importance of considering all factors and all options before arriving at a decision.

---

**10.** *See Montgomery County v. Sanders,* 38 Md.App. 406, 420, 381 A.2d 1154 (1978), where Chief Judge Gilbert for the Court of Special Appeals set forth a partial list of criteria recommended for consideration in child custody cases.

■ *Capacity of the Parents to Communicate and to Reach Shared Decisions Affecting the Child's Welfare.* This is clearly the most important factor in the determination of whether an award of joint legal custody is appropriate, and is relevant as well to a consideration of shared physical custody. Rarely, if ever, should joint legal custody be awarded in the absence of a record of mature conduct on the part of the parents evidencing an ability to effectively communicate with each other concerning the best interest of the child, and then only when it is possible to make a finding of a strong potential for such conduct in the future.

> With few exceptions, courts and commentators agree that joint custody is a viable option only for parents who are able and willing to cooperate with one another in making decisions for their child. *2 Child Custody & Visitation Law and Practice* § 13.05[2], at 13–14 (J.P. McCahey ed. 1985).

*Accord* J. Atkinson, *Criteria for Deciding Child Custody in the Trial and Appellate Courts,* 18 Fam.L.Q. 1, 37 (1984); R. Gardner, *Joint Custody Is Not For Everyone,* 5 Fam.Advoc. 7, 8–9 (1982); P. Axelrod, A. Everett and A. Haralambie, *Joint Custody, supra,* § 5.06, at 55; S. Steinman, *Joint Custody: What We Know, What We Have Yet To Learn, and the Judicial and Legislative Implications,* 16 U.C.D.L.Rev. 739, 744 (1983); Annot., *Propriety of Awarding Joint Custody of Children,* 17 A.L.R.4th 1013, 1016 (1982).

In *Beck v. Beck,* 86 N.J. 480, 432 A.2d 63, 71–72 (1981), the Supreme Court of New Jersey set forth this factor as one of four to be considered in any joint custody case.[11]

---

**11.** The New Jersey court, after opining that the factors necessary for a successful joint custody agreement will "coalesce only infrequently," listed as additional factors, 1) whether the children have established such relationships with both parents that they would benefit from joint custody; 2) whether both parents were physically and psychologically "fit" for parenting; and, 3) whether both parents were willing to accept joint custody. *Beck v. Beck,* 86 N.J. 480, 432 A.2d 63, 71–72 (1981).

In *Kline v. Kline*, 686 S.W.2d 13, 16 (Mo.App.1984), the Missouri Court of Appeals denied a father's request for joint custody and awarded sole custody of the parties' only child to the mother, noting that "the potential for cooperation in joint decision making was far outweighed by the evidence of power struggles and hostility" between the parents, making a joint custodial arrangement inappropriate.

In *Turner v. Turner*, 455 So.2d 1374, 1380 (La.1984), the Supreme Court of Louisiana held that a statutory presumption that joint custody was in the best interests of minor children had been rebutted by evidence indicating that the "parties [were] unable to settle their differences amicably, or to insulate the children from their battles." The court noted that the parties' children would not benefit by a joint custody arrangement since the parents lacked any spirit of cooperation.

In *Heard v. Heard*, 353 N.W.2d 157, 161–62 (Minn.App. 1984), the Court of Appeals of Minnesota held that the evidence did not support a finding that an award of joint custody served the best interests of the parties' children. The court found that the trial judge erred in awarding joint legal custody and divided physical custody when testimony at trial "revealed two people who were unable to communicate and whose negotiations even on such matters as telephone calls by the children sometimes resulted in abusive behavior."

When the evidence discloses severely embittered parents and a relationship marked by dispute, acrimony, and a failure of rational communication, there is nothing to be gained and much to be lost by conditioning the making of decisions affecting the child's welfare upon the mutual agreement of the parties. Even in the absence of bitterness or inability to communicate, if the evidence discloses the parents do not share parenting values, and each insists on adhering to irreconcilable theories of child-rearing, joint legal custody is not appropriate. The parents need not

agree on every aspect of parenting, but their views should not be so widely divergent or so inflexibly maintained as to forecast the probability of continuing disagreement on important matters. In S. Steinman, *Joint Custody: What We Know, What We Have Yet To Learn, and the Judicial and Legislative Implications, supra,* at 745–46, the author listed the characteristics of co-parental relationships found to be important in a study of successful joint custody arrangements:

> Foremost was the sense of respect for one another as parents, despite the disappointment in each other as marriage partners. Each appreciated the value of the other to the child, and was sensitive to the possible loss of a parent-child relationship. The parents' relationships were characterized by a similarity in basic child-rearing values. There was the capacity to tolerate the minor differences that existed and to distinguish the important from the unimportant ones. These parents were able to relinquish control and not interfere in the other parent's relationship with the child. They were personally flexible and able to accommodate to the needs of the arrangement, the child, and even to the other parent. These were not people who were rigid in their thinking or behavior. There was a capacity to contain their anger and hostility and to divert it away from the children. There was an ability to take responsibility for their part in the break-up and their current life rather than project blame onto their ex-mate. Finally, there was a sense of parity in these co-parental relationships. They accepted the premise that they were equally significant to and capable of caring for the children. This meant not only the genuine valuing of the other as a parent in raising the child but, equally as important, it enhanced the parents' own self-confidence. It was important that each parent had a sense of self-esteem as a parent in his or her own right in order to maintain the balance in the co-parental relationship.
>
> These parents were able to separate out their roles and feelings as parents from the marital- and divorce-engen-

dered conflicts. They had rarely argued about the children during the marriage, and were able to maintain a "conflict free" sphere around the children, which they protected through the divorcing process. This capacity was central to a smooth running co-parental arrangement.

Ordinarily the best evidence of compatibility with this criterion will be the past conduct or "track record" of the parties. We recognize, however, that the tensions of separation and litigation will sometimes produce bitterness and lack of ability to cooperate or agree. The trial judge will have to evaluate whether this is a temporary condition, very likely to abate upon resolution of the issues, or whether it is more permanent in nature. Only where the evidence is strong in support of a finding of the existence of a significant potential for compliance with this criterion should joint legal custody be granted. Blind hope that a joint custody agreement will succeed, or that forcing the responsibility of joint decision-making upon the warring parents will bring peace, is not acceptable. In the unusual case where the trial judge concludes that joint legal custody is appropriate notwithstanding the absence of a "track record" of willingness and ability on the part of the parents to cooperate in making decisions dealing with the child's welfare, the trial judge must articulate fully the reasons that support that conclusion.

*Willingness of Parents to Share Custody.* Generally, the parents should be willing to undertake joint custody or it should not be ordered. We are asked by Appellant, and by the Women's Legal Defense Fund as amicus curiae, to hold that a trial judge may never order joint legal custody over the objection of one parent. They argue, with some force, that unwillingness on the part of one parent to share custody inevitably presages intransigence or inability to cooperate in making decisions affecting the welfare of the child. While we agree that the absence of an express willingness on the part of the parents to accept a joint

custody arrangement is a strong indicator that joint legal custody is contraindicated, we are unwilling to fashion a hard and fast rule that would have the effect of granting to either parent veto power over the possibility of a joint custody award. A caring parent, believing that sole custody is in the best interest of the child, may forcefully advance that position throughout the litigation but be willing and able to fully participate in a joint custody arrangement if that is the considered decision of the court.

*Fitness of Parents.* The psychological and physical capabilities of both parents must be considered, although the determination may vary depending upon whether a parent is being evaluated for fitness for legal custody or for physical custody. A parent may be fit for one type of custody but not the other, or neither, or both.

*Relationship Established Between the Child and Each Parent.* When both parents are seen by the child as a source of security and love, there is a favorable climate for joint custody. On the other hand, joint custody may be inappropriate when opposed by the child, or when there are indications that the psychological or emotional needs of the child would suffer under a joint custody arrangement.

*Preference of the Child.* The reasonable preference of a child of suitable age and discretion should be considered. In addition to being sensitive to the possible presence of the "lollipop" or "rescue" syndromes,[12] the trial judge must also recognize that children often experience a strong desire to see separated parents reunited, and this motivation may produce an unrealistic preference for joint custody.

*Potential Disruption of Child's Social and School Life.* Joint physical custody may seriously disrupt the social and

---

12. The so-called "lollipop syndrome" relates to the situation where one parent in a custody battle may shower the child with gifts and pleasant times, and impose no discipline in order to win the child's preference. The "rescue syndrome" relates to the expression of preference by a child for the parent perceived by the child to be the "weaker" of the two, in the belief that the stronger parent will survive in any event, but the weaker parent needs the child.

school life of a child when each parent has the child for half the year, and the homes are not in close proximity to one another. In such cases the amount of time each parent has physical custody may be adjusted without interfering with the concept of continued joint custody.

*Geographic Proximity of Parental Homes.* Parental homes within the same school district offer certain advantages in a joint custody situation. The child may enjoy joint physical custody without changing schools or being required to constantly change a circle of friends, and the parents may find proximity a benefit in discussing the decisions to be made concerning the child. However, distance is not a bar, and when the distance between homes is great, a joint custody arrangement may offer the only practical way to preserve to the child a meaningful relationship with each parent. Depending upon the age and emotional maturity of the child, similarity of the respective home environments may be desired, or exposure to dissimilar environments, cultures and opportunities for learning may be indicated. *See Andrews v. Geyer,* 200 Va. 107, 104 S.E.2d 747 (1958).

*Demands of Parental Employment.* In some situations, joint physical custody will be appropriate only if the work hours of the parents are different, or there is flexibility in the demands of the employment of each.

*Age and Number of Children.* The factor of age obviously interrelates with other factors already discussed. The number of children involved may pose practical difficulties to a joint custody arrangement, but on the other hand may be helpful to both parents in bringing about a sharing of the pressures of single family parenting of a number of children. In rare cases, split custody may be preferred over sole or joint custody.

*Sincerity of Parents' Request.* A number of interested observers have opposed the concept of joint custody absent mutual agreement on the ground that one spouse may interpose a demand for joint custody solely to gain bargain-

ing leverage over the other in extracting favorable alimony, child support or property concessions. *See, e.g.,* B. Levy and C. Chambers, *The Folly of Joint Custody,* 3 Fam.Advoc. 6, 7–8 (Spring, 1981); J. Schulmann and V. Pitt, *Second Thoughts on Joint Child Custody: Analysis of Legislation and its Implication for Women and Children,* in *Joint Custody and Shared Parenting* ch. 19, at 213 (J. Folberg ed. 1984). Drawing upon the reasoning of King Solomon [13] writers have suggested that a parent truly interested in the welfare of a child will give up almost anything to protect the child, and thus the threat of enforced joint custody can be used to extract unwarranted concessions. While the remedy they suggest—denial of joint custody in the absence of parental agreement—is unnecessarily restrictive, we acknowledge the legitimacy of these concerns and highlight the necessity to carefully examine the motives and sincerity of each parent.

*Financial Status of the Parents.* Joint physical custody imposes financial burdens upon the parents because of the necessity of maintaining two homes for the child, with separate furnishings and often separate toys, equipment, and clothing.

*Impact on State or Federal Assistance.* Aid to families with dependent children and eligibility for medical assistance may be affected by the award of joint custody. The necessary showing of "absence" of a parent may be challenged when there is an award of joint custody that includes shared physical custody. Under current standards eligibility may be established in the presence of joint physical

---

**13.** And the king said, Bring me a sword. And they brought a sword before the king.

And the king said, Divide the living child in two, and give half to the one, and half to the other.

Then spake the woman whose the living child was unto the king, for her bowels yearned upon her son, and she said, O my lord, give her the living child, and in no wise slay it. But the other said, Let it be neither mine nor thine, but divide it.

Then the king answered and said, Give her the living child, and in no wise slay it: she is the mother thereof. 1 Kings 4:24–27.

custody, provided joint legal custody does not also exist. *See* Maryland Code (1957, 1985 Repl.Vol.) Art. 88A, §§ 44A–58; COMAR 07.03.02.01; 42 U.S.C. § 606(a)(1); 45 C.F.R. § 233.90(c)(1)(iii).

*Benefit to Parents.* Although the primary focus is properly upon the best interest of the child, it is also appropriate to consider the salutary effect that joint custody may have on the parents, not only because their feelings and interests are worthy of consideration, but also because their improved self-image as parents is likely to redound to the ultimate benefit of the child.

*Other Factors.* The enumeration of factors appropriate for consideration in a joint custody case is not intended to be all-inclusive, and a trial judge should consider all other circumstances that reasonably relate to the issue. The resolution of a custody dispute continues to be one of the most difficult and demanding tasks of a trial judge. It requires thorough consideration of multiple and varied circumstances, full knowledge of the available options, including the positive and negative aspects of various custodial arrangements, and a careful recitation of the facts and conclusions that support the solution ultimately selected. Because most decisions are not subjected to appellate review, and because appellate review is properly limited in scope, *Davis v. Davis,* 280 Md. 119, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), the burden of making an appropriate decision necessarily rests heavily upon the shoulders of the trial judge.

## IV

### This Case

In our review of the record to determine whether the trial judge abused his discretion, we are initially confronted with the problem of understanding the exact nature of the custody arrangement he intended. It is clear he intended to perpetuate the arrangement found to exist at the time of trial, which he characterized as "a sort of joint custody." This was basically the arrangement stipulated by the "visi-

tation schedule" filed by counsel for the parties, which formed the basis of the *pendente lite* custody order. The trial judge described the arrangement as follows:

> Both parents teach school. The father's work day is from about 8:30 A.M. to 4:15 P.M. and the mother's 12:30 P.M. to 4:15 P.M. . . . . In November 1982 the parties agreed upon a sort of joint custody of the children. Their base is in the father's home but the mother probably sees them more of their waking hours. The mother is in the home with the children Monday to Friday from 7:30 A.M. to 12:30 P.M. The mother has the children in her home from 4:15 P.M. to 8:00 P.M. Tuesday and on alternate [weekends] from 10:00 A.M. Saturday until 8:00 P.M. Sunday. The paternal grandmother babysits Monday to Friday from 12:30 P.M. to 4:15 P.M., i.e. from the time the mother leaves the children until the father gets home. The father pays his mother $29.00 weekly. The mother contributes no money for child support.

It is difficult to determine from an examination of the "visitation schedule" filed by the parties whether they were using "visitation" to mean custody, or whether the agreement assumed custody by Appellee with specific visitation rights reserved to Appellant. The temporary custody order provided for "joint custody," but also established a "visitation" schedule for Appellant. The final order, while perpetuating the existing arrangement with respect to physical care of the children, is silent on the question of legal custody.

We think it likely the trial judge intended to grant joint physical custody, but we would have to speculate concerning his intent as to legal custody. Any uncertainty should be resolved by the trial court, and we shall remand for that purpose. Additionally, we conclude that under the particular facts of this case our remand should mandate full reconsideration of the issue of child custody. This disposition will enable the parties and the trial court to address specifically the issues of physical and legal custody, and to measure the facts of this case against the criteria for joint

custody that we have discussed above. Particular attention must be given to the ability and inclination of these parties to effectively communicate with each other, and to agree on those important matters affecting the welfare of the children. Although the record supports the finding of the trial judge that the parties, with the aid of counsel, were able to successfully establish a schedule for the physical care of the children, the record also strongly suggests the presence of considerable hostility between these parents and an inability to effectively communicate directly with each other. We recognize that significant changes may have taken place in the three years that have elapsed since the trial of this matter, and that additional evidence should be received. On remand, the trial court should receive evidence pertaining to developments since the trial, and in the exercise of its discretion may receive additional evidence to supplement the existing record, or may hear *de novo* the matter of custody and related matters of visitation and support.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR CECIL COUNTY FOR FURTHER PROCEEDINGS IN CONFORMITY WITH THIS OPINION. COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEE.