560 A.2d 1145

**William G. HUGHES**

v.

**Patricia A. HUGHES.**

**No. 1660, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

July 21, 1989.

Timothy E. Clarke (Kenary and Clarke, on the brief), Rockville, for appellant.

Scott M. Strickler (Stephen E. Moss, on the brief), Bethesda, for appellee.

Argued before BISHOP, ROSALYN B. BELL and KARWACKI, JJ.

BISHOP, Judge.

William G. Hughes ("William") appeals from an order of the Circuit Court for Montgomery County (Weinstein, J.) which, among other things, awarded William an absolute divorce, and awarded the appellee, Patricia Ann Hughes

("Patricia"): custody of the parties' two minor children; child support in the amount of $700 per month; exclusive use and possession, for two years, of the family home and the personal property located therein; and a monetary award of $7,500. In this appeal, William asks:

I. Whether the court may grant a use and possession order for the family home when legal title to that residence was acquired by William before the marriage.

II. Whether the court erred in granting Patricia a $7,500 monetary award.

III. Whether the court erred in denying William's request for joint custody of the children.

IV. Whether in awarding custody of the children the court imposed a "change of circumstances burden of proof" requirement on William and also assumed that custody should be with Patricia.

V. Whether the court imposed an unconscionable burden on William in the amount of child support ordered.

We answer each of these questions in Patricia's favor and affirm the circuit court's order; we also express our complete agreement with the well written opinion which Judge Weinstein filed in this case and upon which a large part of this opinion is based.

Before discussing the merits of this case we first address Patricia's motion to dismiss the appeal; she complains that William failed to comply with Maryland Rule 8–501 which governs the printing of the record extract.

Rule 8–501(d) requires the appellant to include in the record extract those portions of the record agreed upon by the parties. In the event of a dispute the Rules allow the appellant either to demand advance payment from the appellee to cover the printing expenses for any part of the record that appellee insists be printed, Rule 8–501(d)(4) or to petition the Court, under Rule 8–607(b), to assess against appellee the costs for printing any unnecessary material. Despite these explicit detailed provisions, William's counsel elected to pursue his own personal solution to what he

apparently perceived as approximately 200 "totally irrele-vant" pages in the materials designated by Patricia for inclusion in the record extract. He took it upon himself unilaterally to exclude these materials from the printed extract.

Needless to say, we are not impressed by William's attempt to avoid the Rules by fashioning his own remedy to his perceived problem. Such freewheeling "impairs the ability of this Court to review the proceedings below." *Leaf Co. v. Montgomery County,* 70 Md.App. 170, 172, 520 A.2d 732 (1987); *see also Spivey v. Harris,* 64 Md.App. 619, 498 A.2d 281 (1985). While Patricia has included the neces-sary portions of the text in her "Appendix", this does not alleviate the confusion and imposition on the Court which has had to contend with the inconvenience of reading two record extracts instead of one (it also heightens the costs of litigation). Nevertheless, in the exercise of our discretion, we deny the motion to dismiss.[1] *Leaf Company,* 70 Md. App. at 173, 520 A.2d 732.

## FACTS

The following findings of fact by the trial judge are supported by substantial and competent evidence in the record and, therefore, not "clearly erroneous," Md.Rule 8–131(c).

---

1. The Court would have been inclined to grant Patricia's request to have William reimburse her for the cost of producing the materials which William eliminated from the extract. We find, however, that Patricia has failed to provide us with sufficient evidence of the additional costs she incurred. Her motion merely states that "the cost of producing the brief and appendix for the appellee was $980." She does not provide us with the individual cost of producing the appen-dix of materials which William improperly declined to print. Fur-thermore, we are troubled by the fact that, of the 222 pages in Patricia's appendix, 111 pages should not have been included therein; the appendix includes 66 pages of exhibits and testimony that are not referred to by either party; 10 pages of statutes and rules which should have been included in the brief, Rule 8–504(w)(7); 30 pages of transcript which are also included in the record extract; and five pages of testimony that Patricia never asked to be included in the extract.

The parties were married on December 30, 1982. . . . Two children were born as a result of the marriage, Jacqueline Rose Hughes and Margaret Susan Hughes, twins born on September 6, 1983. . . . [William] is forty-four (44) years old and is employed by the National Association of Federal Veterinarians as an attorney. His net monthly income (after taxes) is three thousand dollars ($3,000). . . . [Patricia] is thirty-nine (39) years old and is currently employed part time . . ., sixteen hours per week at $10.00 an hour. (E 173–174)

In 1975, William purchased an unimproved parcel of land in Easton (the "Easton property") for $37,500. He paid $4,000 in cash and financed the remainder with a purchase money mortgage with payments of $280.22 per month which payments were made continuously from 1975 through the trial date in December 1987. Subsequently, in the summer of 1982, construction began on a $100,000 home on the Easton property (the "Easton home") which was financed in part by a loan of $48,000 from William's mother. Monthly payments of $463.00 were made on this loan from January 1983 through the trial date and, although William's mother ultimately forgave $20,000 of the principal, the amount of the payments remained constant since 1983. Both the Easton home and property were titled in William's name alone.

The parties, along with their children, occupied the Easton home from the time of the children's birth in 1983 until the parties separated in February 1986; at which time, in accordance with their agreements, Patricia remained in the Easton home with the twins and William moved into a $104,000 home which he purchased in Silver Spring. Except for a 3½ month period, November 1986—February 1987, this situation remained unchanged through the trial date.

## I.

### *Use and Possession*

Section 8–208 of the Family Law Article provides judicial authority to award possession and use of the "family

home." There is, however, an express limitation in § 8–201(c)(2) which states, *inter alia*, that:

(2) "Family home" does not include property:

(i) *acquired* before the marriage;

(emphasis added). William contends that the Easton home and the Easton property were "acquired" before the marriage because "[t]he residence in question was titled in the name of, built by, and solely owned and occupied by the plaintiff [ (William) ] before the marriage." He concludes, therefore, that, under § 8–201(c)(2), the Easton home and property are not the proper subject of a use and possession order.

Patricia counters that the Court's previous definition of the term "acquired", as stated in *Harper v. Harper*, 294 Md. 54, 80, 448 A.2d 916 (1982); *see also Grant v. Zich*, 300 Md. 256, 477 A.2d 1163 (1984); *Schweizer v. Schweizer*, 301 Md. 626, 484 A.2d 267 (1984), controls; in *Harper* the Court stated that the term " 'acquired', appearing in [§ 8–201(e) [2] (defines the phrase "marital property") is] the on-going process of making payment for property." She contends that, given this definition of "acquired", the chancellor's determination that the Easton home is a "family home", § 8–201(c), is not clearly erroneous because some of the payments on the Easton home and property were made during the marriage and the property was, therefore, "acquired" during, not after, the marriage.

William distinguishes the case *sub judice* from *Harper*, *Grant*, and *Schweizer* on the basis that those cases involve the interpretation of "acquired" in the context of § 8–201(e) of the Family Law Article (which defines the term "marital property" as that "acquired by 1 or both parties during the marriage") whereas the instant case involves the definition of "acquired" as it appears in § 8–201(c). He argues that the expansive, "source of funds" definition adopted in *Harper* is not suitable in the context of a use and possession

---

**2.** Section 8–201 of the Family Law Article was previously codified as § 3–6A–01(e) of the Courts and Judicial Proceedings Article.

order because the results achieved would be unfair. According to William's argument, for example, when the source of funds theory is employed in the context of a marital property award, a husband who contributes $20 to the payments on the $100,000 marital residence, which is titled solely in the wife's name, is potentially entitled to a monetary award equal to .02 percent of the value of that home, the amount of his contribution. *See Harper,* 294 Md. at 80, 448 A.2d 916. But if that same husband is granted custody of the parties' minor child then, defining acquired as the on going process of making payments, he would be eligible to receive 100 percent of the marital home for a period of up to three years, thereby resulting in a windfall to the husband which would appear to be entirely at the wife's expense.

In place of the *Harper* definition of "acquired" William urges the adoption of the "inception of title theory" which was specifically rejected by the Court in *Harper* and which provides that:

> The word 'acquired' contemplates the inception of title, and as a general rule the character of the title depends upon the existence or nonexistence of the marriage at the time of the incipiency of the right by virtue of which the title is finally extended and perfected.

*Harper,* 294 Md. at 65, 448 A.2d 916. As William's argument makes clear, under this view the court's use and possession order would be improper as William alone obtained title to the Easton home before the marriage.

The Court of Appeals in *Bledsoe v. Bledsoe,* 294 Md. 183, 186–187, 448 A.2d 353 (1982), narrowly avoided the issue suggested here by the parties when the Court observed that:

> Donald first contends that the subject property is not a "family home" within the meaning of the term as defined in ... [§ 8–201(c) of the Family Law Article] because he acquired the property prior to his marriage to Pamela.... Donald argues that this section effectively prevents the Bledsoe home from being a "family home" irrespective of

his 1977 transfer of the property to Pamela and him as tenants by the entirety. While we have uncovered no Maryland case addressing this exact point, we have recognized on many occasions the proposition that property purchased entirely by one spouse but titled in the names of both as joint tenants or tenants by the entirety amounts to a gift to the other spouse of an ownership interest in the property.... Here, then, though Donald acquired the property prior to the marriage, when he created a tenancy by the entirety he made a valid gift to Pamela of an interest in the property. Therefore, this property, being the principal residence of the spouses, could not be excluded from the definition of "family home" solely because he had initially acquired it prior to the marriage.

Accordingly, we must undertake the task of statutory construction which the Court in *Bledsoe* was able to avoid.

In defining the ambiguous terms of a statute, the courts must attempt to enforce a construction which is consistent with the statute's legislative purpose. *See Tucker v. Fireman's Fund Insurance Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986); *State v. Berry*, 287 Md. 491, 413 A.2d 557 (1980). One source of such a legislative purpose is found in the preamble to Ch. 794 of the Acts of 1978 which provides that the purpose underlying §§ 3–6A–01 to 3–6A–07 of the Courts and Judicial Proceedings Article (1980), since recodified as §§ 8–201 to 8–210 of the Family Law Article (1984) [3], is as follows:

The General Assembly declares that it is the policy of this State that marriage is a union between a man and a woman having equal rights under the law. Both spouses owe a duty to contribute his or her best efforts to the marriage, and both, by entering into the marriage, undertake to benefit both spouses and any children they may have.

. . . .

---

**3.** *See* Ch. 296 of the Acts of 1984.

[W]hen a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably, with careful consideration being given to both monetary and nonmonetary contributions made by the respective spouses to the well-being of the family, and further, that if there are minor children in the family their interests must be given particular and favorable attention.

A second source of legislative purpose is found in the statute itself which provides that:

§ 8–206. Family home; family use personal property— Legislative policy.

The court shall exercise its powers under §§ 8–207 through 8–213 of this subtitle:

(1) to enable any child of the family to continue to live in the environment and community that are familiar to the child; and

(2) to provide for the continued occupancy of the family home and possession and use of family use personal property by a party with custody of a child who has a need to live in that home.

These statements of legislative intent evidence three primary concerns by the legislature, the welfare of each of the parties and the welfare of the children, and these three concerns are not always compatible. The potential conflict between them is particularly evident in the context of orders for use and possession of the family home which inevitably benefit the children and the custodial parent to the detriment of the non-custodial parent. Apparently mindful of this conflict, "[t]he legislature ... seems to have lucidly expressed its intent that when awarding use and possession of a family home, and thereby expelling the other spouse from the dwelling, it would only do so when one spouse needed the home for the benefit of the children of that family." *Bledsoe*, 294 Md. at 192, 448 A.2d 353. The Court in *Bledsoe* limited the use and possession order to the "natural or adopted children of the parties to the divorce ..." *Id.* at 193, 448 A.2d 353.

With this legislative intent as a guide, we consider the possible interpretations of "acquired" as that term is used in § 8–201(c). We discern three such possibilities: the two suggested by the parties—the "inception of title theory" and the "on-going process of making payment for property" —and the common or dictionary definition.

The problem with the inception of title theory is that, in the situation *sub judice*, it only protects the interests of the non-custodial parent. This result not only ignores the legislative intent to protect *both* parties, but, more importantly, it also fails to give the children's interests "particular and favorable attention." *Bledsoe, supra.* Accordingly, we reject the inception of title theory as a possible source of a definition.

Defining "acquired" as the on-going process of making payments is also an unacceptable alternative because, unlike marital property, the courts can not possibly grant use and possession of say 45 percent of the family home; for the average family home the extent of the use is all or nothing.

Unlike the foregoing highly technical definitions of acquired, which do not apply in the determination of whether property is subject to a use and possession order, the common meaning of the term fully supports the legislative intent. In its common usage, acquired means "attained by the individual by or as if by his [or her] own efforts". Webster's Third New International Dictionary 18 (1981). Under this definition, a person "acquires" property by his or her "own efforts" when 100 per cent of the funds used to purchase that property are provided by that person alone from premarital funds; a home that has been purchased in part since the date of the marriage, then, has not been "acquired before the marriage" for the exclusionary purposes of § 8–201(c)(2)(i).

The common definition of "acquired" is particularly suitable in the context of § 8–201(c) because it protects the interests of the children as well as the interests of both parents. Unlike either of the other definitions considered, it

protects the interests of the children and the custodial parent by allowing for their use and possession of a home which came into being, at least in part, through the labors of the custodial parent with the common understanding that such efforts would benefit the parties and their children. On the other hand, this definition of acquired, when considered within the context of §§ 8–201 thru 8–210, also protects the interests of the non-custodial parent, even under circumstances where 99 percent of the funds used to purchase the family home were provided by the non-custodial parent before the marriage. A non-custodial parent who has provided such premarital funds is protected by the statute itself which provides that: a use and possession order is limited in duration to three years, § 8–210(a); a use and possession order terminates upon the remarriage of the custodial parent, § 8–210(b); no use and possession order will lie in the case where the non-custodial parent acquired 100 per cent of the home before the marriage, § 8–201(c)(2)(i); and, finally, under § 8–208(b) & (c), in awarding use and possession of the family home the courts must:

[C]onsider each of the following factors:

. . . .

(2) the interest of each party in continuing:

(i) to . . . occupy or use the family home or any part of it as a dwelling place;

(ii) to . . . occupy or use the family home or any part of it for the production of income; and

(3) any hardship imposed on the party whose interest in the family home . . . is infringed on. . . .

(c) Allocation of financial responsibilities.—The court may order or decree that either or both of the parties pay all or any part of:

(1) any mortgage payments or rent;

(2) any indebtedness that is related to the property;

(3) the cost of maintenance, insurance, assessments, and taxes: or

(4) any similar expenses in connection with the property.

▮ In the case *sub judice,* over one-quarter of the payments on the Easton home came from marital funds. In addition, Patricia contributed $4,000.00 of her funds plus labor in the construction of and improvements on the property. Accordingly, we hold that, under § 8–201(c) of the Family Law Article, the chancellor was not "clearly erroneous", Maryland Rule 8–131(c); *Spector v. State,* 289 Md. 407, 433, 425 A.2d 197 (1981), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 407 (1981), in awarding Patricia and the children use and possession of the Easton home.

## II.

### *Monetary Award*

The trial court noted the following specific considerations regarding Patricia's request for a monetary award:

Mrs. Hughes made significant contributions, monetary and non-monetary, to the well being of the family. Mrs. Hughes contributed $4,000.00 to the construction of the Easton home. She bought various household items including lighting fixtures and mirrors. She contributed her efforts and labor in the construction of the house as well as improving the real property. She expended her earnings on clothing for the children. She was the primary caretaker of the children as Mr. Hughes was employed in the District of Columbia and spent a substantial number of hours each day working and commuting to and from the District of Columbia. Additionally, the Court has examined the present economic circumstances of each party. Examining the exhibits and testimony of the parties regarding their respective property interests reveals that the interest of Mr. Hughes in all property is significantly greater than the interest of Mrs. Hughes. The Court has also considered the fact that alimony was not awarded to Mrs. Hughes.

Based on these findings, the court granted Patricia a $7,500 monetary award which William now attacks on various grounds.

William's first complaint is that the payments on the house:

[W]ere made in their entirety by the Plaintiff from his salary. The Defendant did not contribute any *money.* Any of the funds earned by the Defendant, at any time during the marriage, were not shared with the Plaintiff nor incorporated into any household accounts." (Emphasis added).

William's position overlooks the clear mandate of the law that, in determining whether a monetary award is warranted, the court must consider "the contributions, monetary and *non-monetary,* of each party to the well being of the family," § 8–205(a)(1) (emphasis added), as well as the other factors listed in § 8–205(a)(1)–(10) which Judge Weinstein considered. Ignoring for the moment the evidence that Patricia contributed her $4000 retirement account to the marriage, the amount of the court's award is justified by the evidence that Patricia's non-monetary contributions alone were worth considerably more than the $7,500 awarded. The record reflects that she spent a considerable amount of time working on the new house, performed various domestic chores for the parties' mutual well being, and expended significant efforts in bearing and rearing the parties' children.

William next claims that the trial judge's calculation of the monetary award ignores the impact of William's non-marital debt and the fact that he has had to pay for two residences since 1986. The chancellor, however, expressly stated that the monetary award was made in consideration of "the present economic circumstances of each party." That the judge acted pursuant to this statement and limited the monetary award appropriately is clearly evidenced by the relatively small monetary award which he ultimately allowed Patricia; she contributed $4,000 in cash towards the accumulation of the marital property, therefore, the court

**230**

allowed her only $3,500, or $7,500 minus $4,000, for her non-monetary contributions to the marital property. We also observe that William leaves the marriage with assets of over $315,000 while Patricia takes almost nothing.

 Finally, William contends that the trial judge improperly calculated the marital property value of the Easton residence at $32,000. The short answer to this issue is that the court did not make this calculation; William did. A stipulation as to the accuracy of this calculation was made during the following exchange at trial:

MR. CLARKE: [William's attorney] * * * I don't want to concede that it is marital property or family home, but if all we are talking about is $32,600.00, I don't have any objection, and we don't have to worry about how much it is valued at, I will take the arithmetic.

MR. STRICKLER: [Patricia's Attorney] I will accept that, if that is the stipulation, that we have an issue as to whether it is marital or nonmarital, but no—we have an agreement on—

THE COURT: You have an agreement that if it is marital property, the value of the marital portion is $32,600.00, is that correct?

MR. CLARKE: That is right, the universal question, the whole universe is whatever, it is $32,600.00. Our disagreement was on the terminology.

THE COURT: I understand that, but *if the Court should find that it is marital, that the $32,626.05 represents that portion of marital property.*

MR. CLARKE: *That is right,* it is 100 percent, that is not 50 percent, that is 100 percent.

THE COURT: A 100 percent of the marital aspect.

MR. CLARKE: I understand that.

THE COURT: The rest of it would be nonmarital.

MR. CLARKE: Absolutely. I think we are in agreement.

MR. STRICKLER: We are in agreement.

MR. CLARKE: I will state it again so we are exactly—

THE COURT: I know exactly what you mean. You are not conceding that it is marital.

MR. CLARKE: That is correct.

THE COURT: But, if it is determined to be marital, that the number is $32,626.05.

MR. CLARKE: That is correct. Now we don't have to get to the other questions.

(Emphasis added). William, having agreed to this calculation at trial, cannot raise this issue on appeal. Md. Rule 8-131(a). We also reject William's "argument" that the above quoted discussion does not constitute a stipulation.

## III.

### *Denial of Joint Custody*

William next complains that, in denying William's request for joint custody of the children, "Judge Weinstein only considered the tension [between the parties] and not the history of success." He argues that he "has done no wrong," and granting Patricia custody "gives [her] ... a veto power over [his] ... time with his own children."

■ This argument evidences a fundamental misunderstanding of the court's role in a child custody dispute. The court's objective is not, as William infers it is, to punish the less capable parent; rather, the court seeks to effectuate that arrangement which will promote "the best interest of the child." *Ross v. Hoffman*, 280 Md. 172, 175 n. 1, 372 A.2d 582 (1977); *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964 (1986).

We also reject William's premise that, in allowing sole custody to Patricia, the court has given her "veto power over [his] time with his own children." As the Court held in *Taylor*:

With respect to physical custody, there is no difference between the rights and obligations of a parent having temporary custody of a child pursuant to an order of shared physical custody, and one having temporary custody pursuant to an award of visitation. Thus, a determi-

nation to grant legal custody to one parent and to allocate physical custody between the parents may be accomplished either by granting sole custody to one parent and specified rights of visitation to the other, or by granting legal custody to one parent and specified periods of physical custody to each parent. In either instance the effect will be the same.

Based on these fundamentals, we will consider whether the trial judge "abused his discretion," *Taylor*, 306 Md. at 311, 508 A.2d 964, in awarding Patricia sole custody of the parties' minor daughters.

█ Among a number of considerations to be applied in determining whether to award joint custody, the Court has included:

(1) "Capacity of the parents to communicate and to reach shared decisions affecting the child...." *Taylor*, 306 Md. at 304, 508 A.2d 964. This criterion is the most important and "[o]nly where the evidence is strong in support of the existence of a finding of the existence of a significant potential for compliance with this criterion should joint legal custody be granted." *Id.* at 307, 508 A.2d 964.

(2) "Potential disruption of child's social and school life." *Id.* at 308, 508 A.2d 964.

(3) "Fitness of parents." *Id.*

(4) "Demands of parental employment." *Id.* at 309, 508 A.2d 964.

(5) "Geographic proximity of parental homes." *Id.;* and

(6) "Willingness of parents to share custody." *Id.* at 307, 508 A.2d 964.[4]

---

**4.** Other factors stated in *Taylor* as being relevant to the issue of joint custody include: the relationship established between the child and each parent, preference of the child, age and number of the children, sincerity of the parent's request, parents' financial status, impact on state and federal assistance, and the benefits to the parents. *Id.* at 308–311, 508 A.2d 964.

■ Applying the above considerations to the facts *sub judice,* we find that the trial judge did not err in denying William's request for joint custody. The chancellor found that the parties have fixed and divergent views on child rearing and are unwilling to compromise; a finding which, in itself, makes joint custody an unacceptable arrangement, *Taylor,* 306 Md. at 307, 508 A.2d 964, and justifies the chancellor's decision, *id.* at 304, 508 A.2d 964. The court's decision, however, does not rest on this single observation; Judge Weinstein's written opinion reflects that he also considered the additional factors from *Taylor* which are listed *supra:*

> Based on the evidence adduced at trial, the Court finds that the best interest of the children would be served by granting custody to the mother for the following reasons. First, the children have resided in Easton since their birth and, with the exception of one incident in which Mr. Hughes obtained an *ex parte* injunction, have remained in the care and custody of Mrs. Hughes since the parties' separation. Although Mr. Hughes was awarded custody of the children after obtaining an *ex parte* injunction, the children were subsequently returned to the care and custody of Mrs. Hughes. Testimony at this hearing supports the earlier finding that Mr. Hughes was not candid with the Court at the time he obtained the injunction.... Additionally, the children are currently enrolled in school in Easton and have developed friendships with other children from the Easton area. There was also testimony ... supporting Mrs. Hughes's contention that she is a fit and proper parent. Furthermore, there is no evidence which would support the plaintiff's contention that the children's interest would not be served if custody remains with the defendant.

We note further that, according to the uncontroverted evidence, William's job is two hours from Easton and Easton is at least that far from William's current residence. *See* factor 5 *supra.* Furthermore, there is no indication that

Patricia has manifested any desire to share custody with William.[5] *See* factor 6 *supra.*

## IV.

### *Burden of Proof & Improper Assumption*

William next argues that: "the trial court wrongfully imposed upon [him] . . . the burden of overcoming the decision of the Domestic Relations Master" concerning custody of the children, and that "the court imposed upon. [William] . . . the requirement to prove why the children should not be with their mother." In support of his position William cites the following passage from the chancellor's opinion; "[f]urthermore, there is no evidence which would support . . . [William's] contention that the children's interest would not be served if custody remains with [Patricia]."

This attempt to twist the meaning of the court's opinion through an analysis of its individually dissected parts is unpersuasive; as noted, *supra* at III, the chancellor fully considered each of the judicially mandated factors prior to awarding Patricia custody of the minor children. Considering the chancellor's remarks in context, the court's opinion reflects that the evidence on each of the *Taylor* factors weighed in Patricia's favor and that the court's remark which is cited by William to support his burden of proof argument is merely a statement that William's attempts to assail Patricia's parental abilities were not supported by the evidence.

## V.

### *Amount of Support*

Finally, William contends that:

---

5. William makes a great deal of the parties' alleged cooperation in the "pick-up and delivery of the children." This, he argues, coupled with the court's finding that William is an able parent, compels the court to award joint custody. This analysis, however, ignores the bulk of the judge's thorough and well reasoned analysis.

[He is] an attorney ... [with] a net monthly income of Three Thousand Dollars ($3,000.00) [after taxes]. The court, in ordering $700.00 per month child support [for both of the five year old girls] in addition to the payment of all expenses on the residence in ... [Easton], (an additional $823.00 per month), requires the Plaintiff to pay more than half of his income for the support of his children even though they are with him for substantial periods of time.... [I]t is absolutely unconscionable that the Plaintiff should have no money with which to live, and to pay his obligations while the Defendant is awarded this enormous sum which would amount to over $18,000.00 per year, to provide care for the children who are with her only for about half of the time.

As William restated his position at oral argument, he does not contend that the amount of child support in itself is objectionable, but only that the *combination* of the support and the required payments on the family home is unconscionable.

We find no abuse of discretion in the amount of the court's award. William's "Financial Statement," which he filed with the court on February 17, 1987, reflects that his estimated expenses for the two children are $800 per month and William indicated that he was willing to provide this amount in the event that he was granted custody. William also informed the court that he intended to keep both the Easton and his Silver Spring residences after the use and possession order expires. By his own admission then William has the ability to pay *both* the monthly $700 child support and the $823 monthly expenses on the Easton home. Furthermore, of the $1,523 combined monthly payment the majority of that amount, $823.00, is for the mortgage and taxes on the Easton property and is, therefore, money which William will ultimately recoup when the use and possession order expires and he takes sole possession of that asset. We hold, therefore, that the combination of the court ordered child support and the court ordered payments on the family home do not exceed William's

financial ability. *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986); *Holston v. Holston,* 58 Md.App. 308, 317, 473 A.2d 459 (1984).

Although the immediate burden imposed on William by the court's order may be significant, it is clear that, given Patricia's limited income, her negligible assets, and the fact that she was denied all alimony, the court was faced with a situation where either the children would suffer the loss of both their home and necessary financial support or William would have to suffer a three year period of strict financial responsibility. We agree with the circuit court that William rather than the children should bear the strain of the divorce.

APPEAL AFFIRMED. COSTS TO BE PAID BY APPELLANT.