950 A.2d 830

**David J. MANESS**

v.

**Rebecca S. SAWYER.**

**No. 0880, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

June 19, 2008.

296

Anne E. Grover (Brian K. Pearlstein, Brodsky, Greenblatt, Renehan, & Pearlstein, on the brief), Gaithersburg, for appellant.

T. Bruce Hanley, Towson, for appellee.

Panel: MEREDITH, WOODWARD, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR., J., Retired, Specially Assigned.

The appellant, David J. Maness ("Husband"), and the appellee, Rebecca S. Sawyer ("Wife"), were married in North Carolina on June 16, 1994. Two children were born of the marriage: Hayley Louise Maness, born on January 16, 1998, and Sophie Anne Maness, born on May 10, 2001. On December 29, 2005, the Wife filed her petition for a limited divorce and for the immediate custody of the children in the Circuit Court for Anne Arundel County. The ultimate trial of the case before Judge Nancy L. Davis–Loomis began on December 18 and 19, 2006, and was continued on February 28, March 1, March 2, and May 25, 2007. On May 25, Judge Davis–Loomis delivered an oral opinion resolving all issues before the court, followed by the filing of a written Order on that day and a Judgment of Absolute Divorce on May 30.

By the Judgment of Absolute Divorce, Judge Davis–Loomis granted a divorce to the Husband on the basis of the Wife's adultery; awarded to the Wife sole legal and physical custody

of the children;  granted the use and possession of the family home at 449 Alfreton Court in Severna Park to the Wife and children for a period of two years;  ordered the Husband to pay to the Wife the sum of $1,203 per month for child support of the two children;  found the Husband in contempt for having failed to pay the child support ordered in the *pendente lite* order of Judge Michael E. Loney on June 5, 2006, and directed that the Husband could purge himself of that contempt by paying the arrearage of $20,299;  and ordered the Husband to pay the Wife $5,000 as a contribution toward her attorney's fees.

On this appeal, the Husband raises the five contentions

1. that Judge Davis–Loomis erroneously treated 449 Alfreton Court as the "family home" within the meaning of Maryland Code, Family Law Article, § 8–201;

2. that Judge Davis–Loomis abused her discretion in granting sole legal and physical custody of the children to the Wife;

3. that Judge Davis–Loomis abused her discretion in calculating the amount of monthly child support;

4. that Judge Davis–Loomis erroneously calculated the arrearages to be paid to the Wife in order to purge the Husband's contempt;  and

5. that Judge Davis–Loomis abused her discretion in ordering the Husband to pay $5,000 of the Wife's attorney fees.

### "It Takes a Heap of Living To Make A House a Home" Or Does It?

The Husband's most intriguing contention, at least initially, is a teaser and one that may require us to make an educated guess as to the 1978 intention of the Maryland General Assembly.  The issue concerns the status of 449 Alfreton Court in Severna Park. Judge Davis–Loomis awarded the use and possession of that residence to the Wife and children for a period of two years, dating from June 25, 2007.  She did so

pursuant to Maryland Code, Family Law Article, § 8–208(a), which provides in pertinent part:

(a) *Award of possession and use.*—(1) When the court grants ... a limited or absolute divorce, regardless of how *the family home* ... is titled, owned, or leased, *the court may:*

(i) *decide that 1 of the parties shall have the sole possession and use of that property;*

(Emphasis supplied).

The potential problem is with § 8–201(c)(1), "Definitions," which defines "family home" in the following tripartite way:

(c) *Family home.*—(1) "Family home" means the property in this State that:

(i) was used as the principal residence of the parties *when they lived together;*

(ii) is owned or leased by 1 or both of the parties at the time of the proceeding; and

(iii) is being used or will be used as a principal residence by 1 or both of the parties and a child.

(Emphasis supplied).

The Husband contends that 449 Alfreton Court did not qualify as the "family home" because he and his Wife never lived there together. That is literally true, but it is not necessarily dispositive. When the Wife and children first came to Annapolis in September of 2004, the Husband remained in North Carolina. When the Wife and children arrived in Annapolis, they lived first at a Radisson Suite Hotel and then in a furnished apartment on Conduit Street. Early in 2005, the Wife's employer made a rental house, referred to by the parties as "Hillsmere," available to her and the children at a below-market rental rate. When the Husband first arrived in Maryland on March 1, 2005, he lived there, at "Hillsmere," with his Wife and children until July 21, 2005, although he and his Wife did not share a bedroom. By April of 2005, however, the marriage was already in a shambles and the Wife told the Husband that she wished him to vacate the

Hillsmere residence. When he refused to leave, she herself left with the children on July 21, 2005, and moved into the Harbor Gates Apartments in Annapolis. The Husband remained in the Hillsmere residence until November 1, 2005, notwithstanding the owner's regular efforts to get him to leave. On November 1, the Husband showed up at the Wife's apartment and, at the urging of the children, was allowed to sleep there, on a living room sofa, until December of 2005. Thus far in the residential saga, there was obviously no property that would remotely qualify as the "family home."

On approximately November 1, 2005, however, the Husband and Wife settled on 449 Alfreton Court, which the two of them thereafter owned as tenants by the entireties. The Wife and the children moved into the Alfreton Court residence on December 1, 2005. By agreement between Husband and Wife, however, the Husband did not. When he unexpectedly showed up at Alfreton Court on December 14, 2005, and subsequently refused to leave, the Wife and children immediately moved out and back into the Harbor Gates Apartments. They only returned to the Alfreton Court residence on or about June 5, 2006 when the Husband, under a pendente lite order and a threat of contempt, moved out.

From the testimony of the parties, Judge Davis–Loomis found that the Alfreton Court residence had been purchased for the express purpose that the Wife and children would live there.

> It is owned as tenants by the entireties. *It was purchased with the express purpose of the children living in that home with mother.* I know that *father indicated that he intended once he thought that the marital difficulties could be resolved that they would reside there together.*

(Emphasis supplied).

It is also significant that on March 16, 2006, the Husband, along with the Wife, executed an Interim Agreement with respect to the Alfreton Court residence. In that agreement, the parties designated 449 Alfreton Court as the "Family Home." The agreement read:

## "INTERIM AGREEMENT

**THIS INTERIM AGREEMENT** is entered into and effective this 16 day of March, 2006 by and between Rebecca S. Maness (Hereinafter "Wife") and David J. Maness (Hereinafter "Husband").

### RECITALS

**WHEREAS,** the Parties were married on June 18, 1994, by a religious ceremony and as a result of their marriage, two children were born, namely Hayley Louise, born January 16, 1998 and Sophie Anne, born May 10, 2001 (hereinafter the "Minor Children")"

. . .

**WHEREAS,** *the Parties own, as tenants by the entireties, property and improvements known as 449 Alfreton, Court, Severna Park, Maryland 21146 (hereinafter the "Family Home");*

**WHEREAS,** *The Husband is presently residing at the family home.*

**NOW, THEREFORE,** in consideration of the promises and mutual covenants and understanding of each of the Parties, the Parties hereby covenant and agree as follows, all as of the effective date hereof:

1. *Family Home.* The Family Home is subject to a lien of a mortgage. *Wife with the Minor Children shall have the exclusive use and possession of the Family Home and all personal property located in the Family Home* until the first to occur of (i) subsequent agreement of the parties, (ii) subsequent order of the court, (iii) Wife fails to timely pay the mortgage on the family home, (iv) wife no longer has equal shared time custody of the children, (v) an unrelated male resides in the home or (vi) Wife fails to attend counseling as set forth hereinafter."

(Emphasis supplied).

Notwithstanding the facts 1) that, at the time of their divorce, the Husband and Wife owned 449 Alfreton Court; 2)

that that was the only home they owned; and 3) that the Wife and children had been living in that home for 11 months, the Husband maintains that because he and the Wife never stayed under the same roof of 449 Alfreton Court on the same night, it did not qualify as a place where "they [had] lived together." The inevitable conclusion of his logic is that there was no family home and no place, therefore, to which a use and possession order might apply. Judge Davis–Loomis, however, refused to apply such sterile logic. Instead, she ruled:

THE COURT: We still have miles to go before we sleep. All right. Use and possession. *Mother has requested use and possession of family home,* family use personal property. As an adjunct to that, *there is an argument that this home, the Alfreton home, does not meet the definition of a family home.*

I know the argument and *I understand the argument that Mr. Maness and the family never lived together in that home.* Now *I believe* from the intent of the legislature and what they perceived as the family home *that this home meets that definition closely enough.*

*It is owned as tenants by the entireties. It was purchased with the express purpose of the children living in that home with mother.* I know that *father indicated that he intended, once he thought that the marital difficulties could be resolved, that they would reside there together.*

*He went to that home in December 14th of '05 indicating that it was his home, too, and he could live there.* And certainly the point of the use and possession of the family home *only the parent with primary physical custody could be permitted to have use and possession of the home because it is for the children.*

And, again, *it is in the best interest of the children* from stability of the children. These children have, in their short lives, been [moved from] pillar [to] post. They have been in North Carolina. They have been, I believe, in couple of homes in North Carolina. They have been in a home in Okracoke.

They have been in three homes, in three places in Maryland, in a short period of time, the Hillsmere home and the Harbor Gates home and the Alfreton home. Let's give them a rest. Let's let them stay in one place for a while, and so *I am going to grant use and possession beginning today's date, May 25th, to the mother and the minor children.*

And *I am going to make that use and possession for a two-year period* through June 24th. *It is actually two years and a month,* and *my reason for adding that extra month is that if there is moving to occur, I don't want it to occur during the school year while the children are still in school.* You know, right at the end of May, I believe that would be too much chaos as well.

I know that *it has been some period of time that Ms. Maness, the mother [and the] children, have been in the home, and that will continue through June 25th of 2009.* And that is going to be without right of contribution for the mortgage from father during that period of time. So, just to clarify, Ms. Maness, mother, will be responsible for the payment of the mortgage during that period of time.

(Emphasis supplied).

We affirm as a legally correct decision Judge Davis–Loomis's determination that 449 Alfreton Court was the proper object of a use and possession order. It was, moreover, the right thing to do, and that always helps. Although we necessarily reject the Husband's argument, we do not blithely dismiss it. It focuses attention on an unusual little definitional wrinkle that is deserving of analysis. What did the Legislature have in mind when it used the phrase "when they lived together"? Does the phrase set out a necessary condition that, for some plausible purpose, should be considered the *sine qua non* for the very existence of a family home subject to a use and possession order? Or is it, rather, merely a descriptive phrase that, 99% of the time, will serve to identify the property that the Legislature had in mind for use and possession purposes, with nobody's having anticipated the other and aberrational one percent of possible fact patterns? None of

our caselaw has heretofore had to confront the phrase "when they lived together." We now do.

It behooves us, for starters, to take a closer look at § 8–201, defining "Family home." It consists of two subsections, one telling us what the "family home" is and the other telling us what it is not. Subsection (1) tells us what the family home is:

(1) "Family home" means the property in this State that:

(i) was used as the principal residence of the parties when they lived together;

(ii) is owned or leased by 1 or both of the parties at the time of the proceeding; and

(iii) is being used or will be used as a principal residence by 1 or both of the parties and a child.

449 Alfreton Court clearly satisfied (c)(1)(ii) and (c)(1)(iii). It is only (c)(1)(i) that is in doubt. Subsection (2), by contrast, tells us what the "family home" is not:

(2) "Family home" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party; or

(iii) excluded by valid agreement.

None of those express exclusions applies to 449 Alfreton Court.

It might seem that the residence in issue was neither included nor excluded by the statutory definition. It may be that, because of an aberrational fact pattern, 449 Alfreton Court simply falls through the definitional cracks. There could, of course, be other aberrational situations that the Legislature may not have anticipated when it used the phrase "when they lived together." Hypothesize a couple acquiring a home for intended family use, but one spouse, for the weeks or the years that the other spouse and children were then in residence, should be unavoidably away because of the demands of business, of military deployment abroad, of foreign study, of imprisonment, or of confinement in a hospital or nursing home. The absent spouse may never have lived under

the roof for a single night, but we cannot believe that the Maryland Legislature intended, should the marriage then dissolve, to preclude the passage of a use and possession order for the protection of the custodial spouse and children. There would be no intelligible purpose to be served by such a stingy interpretation of a law passed, after all, for the benefit of the children. The phrase "when they lived together" is a convenient and efficacious descriptive phrase that works most of the time, but it is not a talismanic qualifier for the very existence of a "family home."

To keep from being caught in an inadvertent linguistic trap, it will help us if we appreciate what the Legislature was trying to accomplish. In enacting the use and possession provisions in 1978, the General Assembly went out of its way to make its animating purpose clear by expressly including the provision that is now codified as § 8–206, dealing with "Family home; family use personal property—Legislative policy."

> The court shall exercise its powers under §§ 8–207 through 8–213 of this subtitle:
>
> (1) *to enable any child of the family to continue to live in the environment and community that are familiar to the child;* and
>
> (2) *to provide for the continued occupancy of the family home* and possession and use of family use personal property *by a party with custody of a child who has a need to live in that home.*

(Emphasis supplied).

Section 8–208, moreover, the section that in subsection (a) gives a chancellor the actual authority to award the possession and use of a family home, in subsection (b) spells out the "required considerations," which we repeat in pertinent part:

> In awarding the possession and use of the family home and family use personal property, *the court shall consider each of the following factors:*
>
> (1) *the best interests of any child;*
>
> (2) *the interest of each party in continuing:*

(i) ... *to occupy or use the family home* or any part of it as a *dwelling place;* or

(ii) ... to occupy or use the family home or any part of it for the production of income; and

(3) any hardship imposed on the party whose interest in the family home or family use personal property is infringed on by an order issued under §§ 8–207 through 8–213 of this subtitle.

(Emphasis supplied).

■ With the "Legislative policy" of § 8–206 and the "Required considerations" of § 8–208(b) then in the front of the mind, we may look at the status of 449 Alfreton Court as of May 25, 2007, when Judge Davis–Loomis rendered her decision with respect to its use and possession. 449 Alfreton Court had jointly belonged to the Husband and Wife, as tenants by the entireties, for 19 months, from November 1, 2005 through May 25, 2007. For 18 of those months, from December 1, 2005, through May 25, 2007, it had been continuously occupied by some member or members of the immediate family. The Wife and the children had lived there for the two-week period of December 1 through December 14, 2005. The Husband had then lived there for six consecutive months, from December 14, 2005 through June 17, 2006. The Wife and children then resumed their occupancy and, as of the date of Judge Davis–Loomis's use and possession order, had been living there continuously for 11 months and one week, from June 17, 2006, through May 25, 2007. 449 Alfreton Court had been bought, moreover, for the use of the Wife and the children. The Interim Agreement of March 16, 2006, signed by both Husband and Wife, repeatedly referred to 449 Alfreton Court as the "family home." As of the time of the use and possession orders, the children, whose interest according to the Legislature was paramount, had been living in the home and its neighborhood for almost a year and had been attending school nearby for a year. The Maryland General Assembly clearly did not intend that they should be dispossessed.

Throughout the entire 19–month period, it was clearly the intention of both the Wife and the Husband to be domiciled at 449 Alfreton Court. The Wife and children intended for that to be their permanent home. They only desired to keep the Husband out. The Husband, for his part, fully intended for it to be his permanent home. He simply desired that his Wife and children should be reconciled to join him there. As of the moment of the use and possession order, 449 Alfreton Court was unquestionably "the principal residence of the parties" and it had been that for 19 uninterrupted months. It was simply the bizarre case that whenever the Husband came in the front door, the wife, with the children, scooted out the back door.

The Maryland caselaw is completely in line with the statutorily announced legislative policy. The authority for a court to enter a use and possession order came into the law in 1978 as a result of the recommendation of the Governor's Commission on Domestic Relations Laws. In *Pitsenberger v. Pitsenberger*, 287 Md. 20, 24, 410 A.2d 1052 (1980), Chief Judge Robert Murphy referred to the preamble to the new statute.

The new statute has governed property disposition in divorce and annulment actions since its effective date of January 1, 1979. *In a preamble to the statute, the General Assembly declared that*

" ' . . . it is the policy of this State that marriage is a union between a man and a woman having equal rights under the law. Both spouses owe a duty to contribute his or her best efforts to the marriage, and both, by entering into the marriage, undertake to benefit both spouses and any children they may have.

'*The General Assembly declares further that it is the policy of this State* that when a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably, with careful consideration being given to both monetary and nonmonetary contributions made by the respective spouses to the well-being of the family, and further, *that if there are minor children in the family*

*their interest must be given particular and favorable attention.'"*

(Emphasis supplied).

In upholding the constitutionality of the new statute and in pointing out that a temporary use and possession order does not represent an unconstitutional taking of a husband's property, Judge Murphy stressed the State's overriding concern with the interests of the minor child.

> *[T]he State's interest is to ensure that* when a marriage is dissolved, *the interests of minor children in the family are given "particular and favorable attention "*—this being the policy of the State as declared by the General Assembly in the preamble to the statute.... *The procedure* provided for in § 3–6A–06 *seeks to avoid uprooting the children from the home, school, social and community setting upon which they are dependent.*

287 Md. at 31, 410 A.2d 1052 (emphasis supplied).

In *Bledsoe v. Bledsoe,* 294 Md. 183, 189–90, 448 A.2d 353 (1982), Judge Cole traced the history of Maryland's use and possession law and elucidated its purpose by referring to the Comments of the Governor's Commission that proposed the new law.

> In 1976, Governor Marvin Mandel established the Governor's Commission on Domestic Relations Laws to study the constitutional, statutory, and common law regarding marriage and the dissolution of marriage in Maryland. Pursuant to its charter the Commission proposed a bill, ultimately Senate Bill 604, Ch. 794 of the Laws of 1978, to the General Assembly to remedy perceived inequities in the then "Maryland law governing the disposition of real and personal property upon divorce" or annulment. *Report Accompanying The Commission's Proposed Bill On The Disposition Of Property In Connection With A Divorce Or Annulment, at 2 (1978).* The proposed bill was adopted in substantially the same form as the commission proposed it and the comments of the commission on the bill are, therefore, highly relevant.

At page twelve of its report, regarding § 3–6A–06, *the commission explains the purposes to be accomplished by the court in awarding use and possession of the family home* and family use personal property.

*Subsection (a) states two primary purposes which the authority conferred by this Section on the family home should be used to accomplish. These are to permit the children of the family to live in an environment and community which is familiar to them and to permit the continued occupancy of the family home by a spouse who has a special need to live in that home.* The Commission believes, on the one hand, that these two purposes comprise all that are entitled to priority in the exercise of the authority conferred by this Section; on the other, the Commission considers *the accomplishment of these purposes justifies the imposition of the specific burdens on the ready disposability of the property* and on the financial obligation of the respective parties that the exercise of this authority may involve.

Two points are worthy of note in this statement of purposes. First is that the second explicated objective of the statute is to permit the *spouse* with a special need to continue to live in the family home.

(Emphasis supplied).

In *Barr v. Barr,* 58 Md.App. 569, 585, 473 A.2d 1300 (1984), this Court also spoke to the overarching purpose of the use and possession law.

*The sole purpose,* not merely the primary purpose, *of the use and occupancy provision is to permit the child or children of the family to live in the community and environment which is familiar to them. Bledsoe v. Bledsoe,* 294 Md. 183, 191, 448 A.2d 353 (1982). *A parent's or spouse's needs are of no consideration except as those needs* contribute to, or *reflect upon, the obligation she or he owes to the child or children.*

(Emphasis supplied). See also *Kennedy v. Kennedy,* 55 Md. App. 299, 302–06, 462 A.2d 1208 (1983); *Court v. Court,* 67

Md.App. 676, 680–85, 509 A.2d 693 (1986) (this Court treated as the "family home" a house which the family had not actually occupied for the preceding five years); *Hughes v. Hughes,* 80 Md.App. 216, 223–25, 560 A.2d 1145 (1989); *Kelly v. Kelly,* 153 Md.App. 260, 268–69, 836 A.2d 695 (2003).

■ What, then, shall be made of the phrase "when they lived together"? We deem it to be a phrase that well describes a common circumstance that frequently helps to identify the truly critical term "the principal residence of the parties." The phrase, however, does not, we hold, constitute a necessary condition precedent to the very existence of a "principal residence of the parties." It is "the principal residence of the parties" that is the "family home" and that is, therefore, the proper subject of a use and possession order, whether the parties ever actually "lived there together" or not.

### The Custody Award

■ As we undertake our review of the decision to grant sole legal and physical custody to the Wife, the standard of appellate review to be applied is that of abuse of discretion. In *Davis v. Davis,* 280 Md. 119, 124–26, 372 A.2d 231 (1977), Judge Digges resolved any theretofore existing uncertainty in that regard.

*[T]here is some confusion in our cases with respect to the standard of review applicable to the chancellor's ultimate conclusion as to which party should be awarded custody.* Notwithstanding some language in our opinions that this conclusion cannot be set aside unless clearly erroneous, we believe that, because such a conclusion technically is not a matter of fact, the clearly erroneous standard has no applicability. However, we also repudiate the suggestion contained in some of our predecessors' opinions, that appellate courts must exercise their "own sound judgment" in determining whether the conclusion of the chancellor was the best one. Quite to the contrary, *it is within the sound discretion of the chancellor to award custody according to the exigencies of each case, Miller v. Miller,* 191 Md. 396, 407, 62 A.2d 293, 298 (1948), and as our decisions indicate, a

reviewing court may interfere with such a determination only *on a clear showing of abuse of that discretion* . . . .

In sum, we point out that three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, *when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.*

(Emphasis supplied).

In *Ross v. Hoffman,* 280 Md. 172, 186, 372 A.2d 582 (1977), Judge Orth reaffirmed resort to that abuse of discretion standard.

The teaching of *Davis v. Davis, supra,* is plain. *The ultimate conclusion as to the custody of a child is within the sound discretion of the chancellor.* That conclusion is neither bound by the strictures of the clearly erroneous rule, that rule applying only to factual findings of the chancellor in reaching the conclusion, nor is it a matter of the best judgment of the reviewing court. *It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused.*

(Emphasis supplied).

This Court in *Jordan v. Jordan,* 50 Md.App. 437, 442, 439 A.2d 26 (1982), further explained why the abuse of discretion standard is necessarily the proper standard to be applied.

The reason why the chancellor is vested with such broad discretion is:

[B]ecause only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; *he is in a far better position than is an appellate*

*court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.*

(Emphasis supplied).

In exercising her discretion on the custody issue, Judge Davis–Loomis correctly focused her attention on the best interests of the children.

*The next issue* that was hotly contested by the parties *is the issue of custody.* Father is arguing that there is a presumption of joint custody and that he relied on case law for that. *There is no presumption that joint custody is the standard.*

*What is the standard is what is in the best interests of the children.* Now obviously I think that most agree that it is good for both parties to have as much access to the children as possible, but certainly *what is the overall and overarching concern is what is in the best interest of the children.*

(Emphasis supplied).

That focus was totally in line with the clear direction of the Court of Appeals in *Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986).

We emphasize that *in any child custody case, the paramount concern is the best interest of the child.* As Judge Orth pointed out for the Court in *Ross v. Hoffman,* 280 Md. 172, 175 n. 1, 372 A.2d 582 (1977), we have variously characterized this standard as being "of transcendent importance" and the "sole question." *The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak.*

(Emphasis supplied).

In determining which custody arrangement is in the best interests of the children, Chief Judge Gilbert, in *Montgomery County v. Sanders,* 38 Md.App. 406, 420, 381 A.2d 1154 (1977), set out a list, albeit not necessarily an exhaustive list, of at least ten factors that should be weighed in making such a determination. See also *Taylor v. Taylor,* 306 Md. at 303–11, 508 A.2d 964. In the course of her 53–page opinion from the bench, Judge Davis–Loomis meticulously considered each of

the *Montgomery County v. Sanders* factors. At the outset of the analysis, the Wife, the ultimate recipient of the custody award, was found to be a fit and competent person to assume custody.

Now starting with the custody factors, the first one in *Montgomery County v. Saunders* is the fitness of the parents. [C]ertainly as to the mother, she has over the years and certainly periods of time when father was living elsewhere has had the primary custody of the children.

And even with all of the testimony that I heard and the problems between the parties, *I did not hear at any point that she was not a fit and proper person to be a custodian of the children. I didn't hear at any point that she in any way didn't provide very good care for these two young girls, and that in fact that both girls are thriving.*

(Emphasis supplied).

With respect to the Husband, Judge Davis–Loomis found that at times he had created "chaos" not only in the life of the Wife but in the lives of the children.

*[T]here has been in my opinion chaos.* The mother moved from the home in Hillsmere to an apartment in Harbor Gates with the girls. [T]hat home was owned by the senior partner in the firm that she was working with who wanted father out.

*Father ended up apparently sleeping on the floor of the Harbor Gates apartment for some period of days because he said he had nowhere else to go.* The home on Alfreton Court was purchased, and the mother and the girls moved in on December 1st of '05.

Then *Mr. Maness, father, showed up* on December 14th of '05, after a Christmas program for the girls, *and told mother that he had moved in. So mother then took the girls back to the apartment. Certainly not in any way an ideal circumstance.*

(Emphasis supplied).

Judge Davis–Loomis noted an incident in which the Husband, with no notice to the Wife, had taken the children from school and left her utterly in the dark as to their whereabouts.

*In January of 2006* the testimony to the Court was that *father took the girls from school.*

*Mother was frantic to know where they were. He didn't answer his cell phone. He did bring them back at 9:00 p.m.* and told mother he would take the girls anytime.

There was an agreement that the parties reached in March of 2005 for father to leave the Alfreton residence that he resided in after that December date that he showed up. They both signed it, but then I think because there was an issue of furniture that hadn't been addressed, that was not honored.

Mother and the children stayed out, and then *even after the pendente lite hearing* there were issues in Mr. Maness, father, leaving, and *he didn't move out until June 23rd although the PL hearing had been, I believe, almost a couple of weeks before and it was to be immediate use and possession.*

(Emphasis supplied).

There were two extended periods of time—one when both the Husband and Wife were still in North Carolina and the other when the Wife was in Annapolis and the Husband was still in North Carolina—when the burden of making visitation possible between the Husband and the children rested almost entirely on the shoulders of the Wife, with the Husband doing little to accommodate the difficult logistics. Judge Davis–Loomis found:

There was a lot of time that mother spent from—certainly from September of 2004 until March of 2005 where mother was living in Annapolis with the girls and would drive, pick the girls up from school, drive them down for the weekend to North Carolina.

It would be on a Friday night a very long drive, probably seven or eight hours, coming back a five-and-a-half hour drive, that she did so that father had visitation. And when

he came to this area he would fly in and—part of the testimony was that he would come into Dulles, and again that would be a difficult for mother to pick him up at the airport.

There were periods of time, and I think this is an important factor, too, that—certainly father was unemployed for a period of time from May to December of 2003. To get a job father was living Avon, North Carolina, and mother was living in Raleigh or in a suburb of Raleigh and working three days a week.

She would again take the girls and drive down on weekends. This was for a seven-month period of time. *Candidly, there were long periods in this marriage when Ms. Maness, the mother, shouldered the burden of caring for these girls and shouldered the burden of long drives to make the girls accessible to father, to Mr. Maness.*

(Emphasis supplied).

Judge Davis–Loomis made a relative character assessment of the two parents.

From the testimony that I received I believe that *mother many times went above and beyond to try to have these girls have access to their father,* to give some normality, and *I believe that from the actions of father that there was a lot that he did that seemed more of concern to him than what was in the best interests of his children.*

(Emphasis supplied).

With respect to the Husband, Judge Davis–Loomis also found that there was a history of mental depression.

The mental condition, clearly I have [found] that father had periods and bouts of depression in 1995 and '96. In 1999 to 2000 there was reflex problems. He had sleeping problems. There was some medication.

Let me go back to August of 2002 to May of 2003, another period of depression. Father was not employed at that time. July of 2005, when mother left, he said he would kill himself. September of 2005 he was on Zoloft at the time.

September I think was the period of time when he had he—it was mother's testimony he had a loaded handgun

under the seat of the car, and that was obviously a serious concern because of the periods of depression that Mr. Maness had had in the past.

■ The Husband argues strenuously that the trial court abused its discretion in not ordering joint custody. *Taylor v. Taylor,* 306 Md. at 303, 508 A.2d 964, makes it clear, however, that the option of joint custody is simply one aspect of the broad discretionary ruling that the court is called upon to make.

> *The question of whether to award joint custody is* not considered in a vacuum, but as *a part of the overall consideration of a custody dispute. The availability of joint custody,* in any of its multiple forms, *is but another option available to the trial judge.* Thus, the factors that trial judges ordinarily consider in child custody cases remain relevant.

(Emphasis supplied).

■ A "track record" of agreement and cooperation between the parents is an important factor to be considered in determining whether joint custody is worth risking. *Taylor v. Taylor,* 306 Md. at 307, 508 A.2d 964, observed in this regard:

> Ordinarily *the best evidence of compatibility with this criterion will be the past conduct or "track record" of the parties.* We recognize, however, that the tensions of separation and litigation will sometimes produce bitterness and lack of ability to cooperate or agree. The trial judge will have to evaluate whether this is a temporary condition, very likely to abate upon resolution of the issues, or whether it is more permanent in nature. *Only where the evidence is strong in support of a finding of the existence of a significant potential for compliance with this criterion should joint legal custody be granted. Blind hope that a joint custody agreement will succeed,* or that forcing the responsibility of joint decision-making upon the warring parents will bring peace, *is not acceptable.*

(Emphasis supplied).

It was the belief of Judge Davis–Loomis that this Husband and Wife were not good candidates for joint custody.

> *There has been a lot [of] squabbling. Every issue seems to have been a major issue, and I think that that counter-indicates a joint custodial arrangement.* [There] is in *Taylor v. Taylor* a statement [that] the ability of the parties to agree [is important] and that, certainly through this litigation, has been a thing that has not been possible.
>
> Through the initial agreement that the parties [reached] and then was not put into effect, and then even after the PL hearing and not being able to have that occur, not being able to agree on selling property that they owned. And *I think that very strongly counter-indicates the ability of the parties to work together and agree, and that is a counter-indication.*

(Emphasis supplied).

The Husband cites no reported case that has ever held that a chancellor's decision not to grant joint custody was an abuse of discretion and we know of none.

The standard that Judge Davis–Loomis applied was clear.

> I am not concerned about what is best for mother. I am not concerned about what is best for father. I am con-cerned about what I believe is best for these children, and *I believe that the evidence strongly suggests that what is best is that mother have sole custody of these children.*

(Emphasis supplied). Her decision was equally clear.

> So *I will grant the mother,* Rebecca Maness, *sole legal and physical custody of the minor children.* I will order that she discuss with father all important issues regarding the children. Educational issues, medical issues, religious issues, all of that information is to be discussed with father.

(Emphasis supplied). We see no abuse of discretion.

### The Child Support Award

■ The Husband contends that the trial court abused its discretion in ordering him to pay child support in the amount

of $1,203 per month. Family Law Article, § 12–204 sets forth the guidelines to be used in determining a child support award. Subsection 12–204(d), however, further provides that if the combined adjusted actual income of the two parents "exceeds the highest level specified in the schedule in subsection (e) of this section," to wit, $10,000 per month, "the court may use its discretion in setting the amount of child support." Judge Davis–Loomis initially determined that the combined monthly income of the Husband and Wife was $16,166 and that the situation before her was, therefore, an above-guidelines case.

The next issue is the child support issue. I am going to pass out the guidelines worksheet. . . .

And looking at this guidelines worksheet when you see it, I find that mother has a monthly actual income before taxes of $8,333, that father has an income of $7,833, for a combined monthly income of $16,166. *This is clearly an over-the-guidelines case,* but case law certainly indicates the Court can extrapolate from that and use the guidelines as its guide, and I have done so.

(Emphasis supplied).

As we consider the contention, therefore, we are to assess Judge Davis–Loomis's decision by the abuse of discretion standard. In *Chimes v. Michael,* 131 Md.App. 271, 288–90, 748 A.2d 1065 (2000), Judge Thieme discussed the abuse of discretion standard as it applies to an above-guidelines case.

Although the child support guidelines apply in most cases, *the trial court may exercise discretion in setting the basic support obligation when the combined adjusted actual income of the parents exceeds $10,000 per month.*

The legislative history and case law do not obscure the fact that the *legislature left the task of awards above the guidelines to the chancellor precisely because such awards defied any simple mathematical solution. Allowing judicial discretion promotes the policy behind the guidelines,* that, *even at very high income levels, "a child's standard of*

*living should be altered as little as possible by the dissolu-
tion of the family."*

. . .

In cases such as this one, *where the guidelines do not
apply, calculation of child support falls within the chancel-
lor's sound discretion.* The chancellor will "examine the
needs of the child in light of the parents' resources and
determine the amount of support necessary to ensure that
the child's standard of living does not suffer because of the
parents' separation."

(Emphasis supplied). See also *Voishan v. Palma,* 327 Md.
318, 329, 332, 609 A.2d 319 (1992); *Johnson v. Johnson,* 152
Md.App. 609, 614, 833 A.2d 46 (2003); *Smith v. Freeman,* 149
Md.App. 1, 20, 814 A.2d 65 (2002); *Ley v. Forman,* 144
Md.App. 658, 675, 800 A.2d 1 (2002).

After determining the respective monthly income of the
parents, Judge Davis–Loomis went on:

The health insurance premium is carried by father, and I
went through from the testimony and the notes I had taken,
added up the insurance for dental, for all that, and it came
out to $203 a month. The work-related childcare expenses
that were indicated in the testimony [of the] mother and
from the exhibits for $421 a month, and the child support
obligation then is $1,203 per month.

And as I indicated, that amount has an effective date of
April 1, 2007.

The Husband argues only that Judge Davis–Loomis abused
her discretion by not taking into consideration the heavy debts
that he was carrying. On the contrary, the judge, at the very
outset of her opinion, took cognizance of the fact that both the
Husband and the Wife had severe financial difficulties and
that they, despite good incomes, had been very lax in manag-
ing their financial responsibilities. It was, however, a problem
shared by Husband and Wife alike.

Now in terms of beginning this decision, one of the things
that I have to say is that obviously, as counsel and the

parties both know, *the financial aspects of this are troubling and the parties are in serious financial straits.* And try as I might to look through it all, I finally came to the realization that that was something I was not going to be able to fix, and so I just want to state that to begin with.

(Emphasis supplied).

The Husband's income supported the determination of the child support award. The judge's decision made certain that the children were not going to suffer because of the financial indiscipline of their parents. If, in order to meet their obligations to their children, one or both parents had to buckle down to a more rigorous financial discipline or even to forego other seemingly important expenditures, so be it. We see no abuse of discretion in such a determination as a way of setting the Husband's financial priorities for him.

Fully half of the three pages that the Husband devotes to this contention consists of his complaint that he should not have been ordered to send his children to an expensive private school. This is a non-issue, for Judge Davis–Loomis never ordered any such thing. It was the Husband and Wife themselves who, by mutual agreement, made that decision. Judge Davis–Loomis simply confirmed that such a decision had been made by them.

Now, the private school. I know from the parties' agreement that the children will continue to attend Chesapeake [Montessori School]—*am I correct?*

(Emphasis supplied). No dissent, incidentally, was registered.

The Husband himself indeed testified that, from the division of proceeds from the sale of stock, the full tuition at the Chesapeake Montessori School had already been paid for the 2006–2007 school year and had also been paid in advance for the 2007–2008 school year.

Q Now you also made a payment to the Montessori School, the Chesapeake Montessori School.

A Yes.

Q How much did you pay Chesapeake Montessori School?

A $37,000.

. . .

Q Why did you pay Montessori School a year in advance?

A I proposed that because I was afraid that they wouldn't invite the kids back for the next year.

. . .

Q Why is that your concern? What was motivating you to send $37,000 down to the Chesapeake Montessori School?

A Well, if we didn't pay it then, I had no way to pay it out of operating income. So this was a chance to take care of the thing.

Q And was Mrs. Maness agreeable?

A Yes.

Q All right. So at this stage of the game, the Maness children are secure at the Chesapeake Montessori School through the school year 2006/2007 and 2007/2008. Is that correct?

A That's correct.

The Judgment of Absolute Divorce issued on May 30, 2007, never ordered that the children should attend private school. It simply ordered that, **IF THEY DID,** then the tuition costs should be allocated 52% to the Wife and 48% to the Husband.

6. For school years subsequent to the 2007–2008 school year, **IF THE MINOR CHILDREN CONTINUE TO AT-TEND PRIVATE SCHOOL,** Mother shall pay 52 percent of the cost of schooling and Father should pay 48 percent.

The schooling question is self-evidently a non-issue.

### Contempt and Arrearages

The two-volume Record Extract in this case runs to 1325 pages. The Husband devotes three pages of his appellate

brief to his fourth contention, wherein he alleges 1) that Judge David–Loomis erroneously calculated the child support arrearages owed by him and 2) that he "had no present ability to pay" the amount set in the purge order. We have scrutinized every line of those three pages and can find no references to any place in the trial proceedings where the Husband 1) argued or testified that he was not in contempt for failure to make the child support payment he was directed to make by Judge Loney's *pendente lite* order of June 5, 2006; 2) argued or testified with respect to the calculation of arrearages; or 3) made any semblance of an objection after Judge Davis–Loomis, on May 25, 2007, announced her finding that the Husband was in contempt, made her finding with respect to the amount of arrearages, and announced the condition for purging that contempt.

Although the merits, were they to be discussed, would be overwhelmingly against the Husband in any event, it would make a mockery of orderly appellate procedure to dignify this contention by any discussion of those merits.

### Attorney's Fees

■ Family Law Article, § 12–103 authorizes a trial judge to make an award of counsel fees to one party from the other under certain conditions. The section provides, in pertinent part:

(a) *In general.*—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

. . . .

(b) *Required considerations.* Before a court may award costs and counsel fees under this section, *the court shall consider:*

(1) the financial status of each party;

(2) the needs of each party; and

(3) *whether there was substantial justification for bringing, maintaining, or defending the proceeding.*

(c) *Absence of substantial justification.—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.*

(Emphasis supplied).

Judge Davis–Loomis was well aware of the pertinent criteria.

[A]mong [the] things that the Court has to consider is whether there was substantial justification bringing, maintaining or defending a proceeding that deals with certainly child support, custody support, or visitation of the parties, arrearages, all of those things.

So it does allow for counsel fees. It says before the Court may award costs and counsel fees the Court shall consider the financial status of each party, the needs of each party, and whether there was substantial justification for bringing, maintaining, or defending the proceeding.

The court ordered that the Husband should pay $5,000 of the Wife's attorney's fees. The Husband makes a totally unfocused attack upon that order as an abuse of discretion. In looking at the "substantial justification" factor, the Husband treats the entire divorce and custody action as an undifferentiated whole rather then zeroing in on the more limited fragment of the larger picture with respect to which the judge made her actual and more limited decision. The Husband argues:

By stark contrast, Appellee in this case filed a petition for divorce based on voluntary separation and desertion. Testimony presented established that Appellee was the party who deserted Appellant and absconded with the parties' minor children. Furthermore, it was unquestionable that any separation of the parties was not voluntary. Indeed, the Trial Court granted the parties an absolute divorce based on Appellee's adultery. Appellee had no "substantial justification" for instituting the proceedings in this case, and

caused each party to incur significant attorney's fees, including, without limitation, costs for filing and arguing Appellee's failure to state viable grounds for divorce.

Judge Davis–Loomis's ruling, however, was far more tightly focused than that. The only aspect of the larger proceeding that she found to have been necessitated without substantial justification was the contempt action against the Husband. In the *pendente lite* order of June 5, 2006, the Husband had been ordered to pay child support in the amount of $2,400 per month. The Husband never sought a modification of that order. But for a single $500 payment on the first day of trial, December 18, 2006, the Husband simply ignored the court's order. He ran up an arrearage, as of March 1, 2007, of $20,299 in unpaid child support. At no time did he attempt to explain to the court why he was not making payments. Although he later challenged (albeit only on appeal) the amount of the arrearage, he never defended his contempt generally. It was this ignoring of the court order, in forcing the wife to resort to a contempt proceeding in an effort to obtain the money that was due her, that Judge Davis–Loomis found to have been without "substantial justification."

The Wife's total legal bills exceeded $52,000. The award of $5,000 was only to pay that part of the larger fee attributable to litigating the contempt phase of the case. Judge Davis–Loomis's precise ruling in this regard was:

> What I am going to do, *the one thing* that I believe that *I can look at* very squarely *is the contempt proceeding, the failure to pay child support.* And *that certainly was a part of this proceeding,* and even though it an exceedingly minor part or—minor amount of Ms. Maness' entire attorneys fees bill, what I am going to do is considering these figures—and understanding that *there were months and months where there was no child support payment* by Mr. Maness *and* no—what the Court believes is *no good explanation for that.*
>
> *I am going to award Ms. Maness $5,000 in attorneys fees.* That is to be paid within—again, knowing the parties'

circumstances, 90 days. If not paid in that time it is to be reduced to judgement.

(Emphasis supplied).

We see no abuse of discretion in the making of that award. Accordingly, the decision we filed on April 29, 2008, in order to comply with the 60–day after oral argument filing deadline pursuant to Maryland Rule 8–207(a)(5), affirmed the judgment of the circuit court in all respects. Although our decision was filed on April 29, 2008, it was at that time filed as an unreported case. For the sake of completeness in the now reported opinion, it seems appropriate to repeat the mandate here.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**